IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHELE WIDMER,                          )
                                         )
    Plaintiff,                           )
                                         )
v.                                       )          Civil Action No. 1:21-cv-748 (RDA/IDD)
                                         )
LLOYD J. AUSTIN, III,                    )
                                         )
    Defendant.                           )

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. 38) and Plaintiff's Motion for Partial Summary Judgment (Dkt. 41). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motions, the parties' oppositions (Dkt. Nos. 46; 47), and the parties' replies in support of their Motions (Dkt. Nos. 49; 50), it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 38) is GRANTED and Plaintiff's Motion for Partial Summary Judgment (Dkt. 41) is DENIED. For the reasons that follow, judgment will be entered against Plaintiff because there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law.

I. BACKGROUND

A. Factual Background

Although the parties dispute certain facts, the following facts are undisputed for the purposes of Defendant's summary judgment motion. Dkt. 39 at 3-10; Dkt. 47 at 1-9.[1]

---

[1] Disputed material facts that are relevant to the summary judgment motions are included in this factual summary, although those disputed facts do not control the disposition.

Plaintiff was employed at the National Geospatial-Intelligence Agency ("NGA") from June 15, 2015 until October 18, 2019.  Dkt. 39 at 3, ¶ 1; Dkt. 47 at 1, ¶ 1.[2]   Around 2016, Plaintiff joined the Geospatial Intelligence Enterprise Directorate ("GIED"), where she worked as a Senior Business Analyst.  Dkt. 39 at 3, ¶ 2; Dkt. 47 at 2, ¶ 2.

In early 2018, Jeffrey Martin became Plaintiff's direct supervisor.  Dkt. 47 at 7, ¶ 4.[3] Following that change, Plaintiff frequently asked her second-level supervisor, Joel Maloney, to assign her a different supervisor.  *Id.* at 7, ¶¶ 5-7; *see* Dkt. 42-1, 14:2-16:16 (Maloney testimony describing his conversations with Plaintiff).

Plaintiff generally received favorable performance evaluations when she was at GIED. Dkt. 39 at 4, ¶ 3; Dkt. 47 at 2, ¶ 3.  Her supervisors gave her "excellent" ratings on April 18, 2018 and on November 15, 2018.  Dkt. 39 at 4, ¶ 3; Dkt. 47 at 2, ¶ 3.  She also received "certificates of appreciation" from the Chair of the National Geospatial Intelligence Committee and Joel Maloney. Dkt. 39 at 4, ¶ 3; Dkt. 47 at 2, ¶ 3; *see* Dkt. 39-2, Exs. 8-9 (certificates of appreciation).  However, Plaintiff claims that on April 4, 2018, NGA management downgraded an initial Performance Evaluation of "Excellent" that she had received in February of 2018.  Dkt. 47 at 8, ¶ 15; *see* Dkt. 39-2, Ex. 2, 134:23-137:9 (Widmer testimony about the interim performance evaluation).[4]

1. Plaintiff's E.E.O.C. Activity

Plaintiff filed a formal E.E.O. complaint on March 22, 2016.  Dkt. 39 at 4, ¶ 5; Dkt. 47 at 2-3, ¶ 5.  In that complaint, she claimed that she experienced "illegal discrimination on the basis

---

[2] The Court treats any facts that are listed in Defendant's statement of undisputed facts and not specifically controverted by Plaintiff as admitted.  *Hayes v. Sotera Def. Sol's, Inc.*, 1:15-cv-1130, 2016 WL 2827515, at *2 (E.D. Va. May 12, 2016).

[3] Defendant did not dispute this fact.

[4] This fact is disputed.

of [her] sex/gender, harassment, and reprisal stemming from making protected and confidential disclosures of harassment, prohibited personnel actions based on reprisal, and a pervasive hostile work environment." Dkt. 39-2, Ex. 11, at 1.[5]  Plaintiff's E.E.O. complaint was assigned Case File Number NGAE-16-PA003.  Dkt. 39 at 5, ¶ 6; Dkt. 47 at 3, ¶ 6.  An investigation report was prepared and issued on November 15, 2016.  Dkt. 39 at 5, ¶ 6; Dkt. 47 at 3, ¶ 6; *see* Dkt. 39-3, Ex. 13 (investigation report).

Plaintiff requested a hearing before the E.E.O.C. on December 26, 2016.  Dkt. 39 at 5, ¶ 7; Dkt. 47 at 3, ¶ 7; *see* Dkt. 39-3, Ex. 14, at 3 (request for hearing).  That request was transmitted to the E.E.O.C. on January 27, 2017.  Dkt. 39 at 5, ¶ 7; Dkt. 47 at 3, ¶ 7; *see* Dkt. 39-3, Ex. 14, at 1-2 (transmittal to E.E.O.C.).  The complaint was then docketed and assigned to Administrative Judge Kevin McEvoy.  Dkt. 39 at 5-6, ¶ 8; Dkt. 47 at 3, ¶ 8.

On April 20, 2018, Administrative Judge McEvoy sent the parties a "Notice of Proposed Summary Judgment."  Dkt. 39 at 6, ¶ 9; *see* Dkt. 39-4, Ex. 16 (Notice of Proposed Summary Judgment).[6]  In that notice, Judge McEvoy informed the parties that he had reviewed the

---

[5] The Court can properly consider the exhibits attached to Defendant's Motion for Summary Judgment that Plaintiff did not object to.  *McCloud v. Rice*, 4:20-cv-4, 2022 WL 18146043, at *3 (E.D. Va. Dec. 21, 2022).

[6] Plaintiff sets forth three objections to this exhibit and Defendant's Statement of Fact about the April 20, 2018 Notice of Summary Judgement.  She argues: (1) the "facts as set forth are not verified and therefore improper under Fed. R. Civ. P. 56[;]" (2) the statement as set out by Defendant is "inadmissible hearsay[;]" (3) the statement is irrelevant.  Dkt. 47 at 3, ¶ 9.

All of Plaintiff's objections in this regard are unavailing.  It is unclear what objection Plaintiff is bringing by claiming the facts are "not verified."  To the extent she claims that Exhibit 15 has not been authenticated, it is self-authenticating pursuant to Federal Rule of Evidence 902(1), as it contains the EEOC seal and a signature.  *See Dawson v. Akal Sec. Inc.*, 660 F. App'x 504, 505-06 (9th Cir. 2016) (holding that an E.E.O.C. letter is a self-authenticating document).  If Defendant is seeking to use the letter substantively, it is admissible hearsay evidence pursuant to Federal Rule of Evidence 803(8).  *See Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) ("Prior administrative findings made with respect to an employment discrimination claim may, of

investigation report, determined that there may not be issues of material fact, and that he was considering issuing a Summary Judgment decision in favor of NGA.  Dkt. 39 at 6, ¶ 9; Dkt. 39-4, Ex. 16, at 1.  He also instructed the parties to submit responses to his Notice by May 11, 2018. Dkt. 39 at 6, ¶ 9; Dkt. 39-4, Ex. 16, at 5.  NGA filed its response on May 10, 2018, while Plaintiff filed her response alongside a response to the proposed issues of fact on May 11, 2018.  Dkt. 39 at 6, ¶¶ 10-11, Dkt. 47 at 3, ¶¶ 10-11; *see* Dkt. 39-4, Exs. 17-19 (NGA and Plaintiff filings).  The E.E.O.C. issued its decision entering summary judgment for NGA on May 14, 2018.  Dkt. 39 at 6, ¶ 12, *see* Dkt. 39-4, Ex. 15 (E.E.O.C. decision).[7]  Plaintiff claims that three days after that decision, the Deputy Director of the Inspector General searched her desk.  Dkt. 47 at 3, ¶ 12; *see* Dkt. 39-2, Ex. 2, 169:15-24 (Plaintiff testimony about her desk being searched).

### 2. Plaintiff's Issues at NGA

#### *a. Leave Issues*

Plaintiff sought, and took, medical leave in late 2017.  Under NGA's leave policy, employees who needed to take medical leave but had insufficient paid leave hours could apply for paid leave hours from a leave bank.  Dkt. 39 at 6, ¶ 13; Dkt. 47 at 3, ¶ 13.  The leave bank would provide the employee with paid leave throughout the course of their medical emergency.  Dkt. 39 at 6, ¶ 13; Dkt. 47 at 3, ¶ 13.  To qualify, NGA employees had to be a part of the voluntary leave bank program and had to have exhausted all of their available paid leave.  Dkt. 39 at 6, ¶ 13; Dkt.

---

course, be admitted as evidence at a federal-sector trial de novo.").  Finally, Plaintiff's E.E.O.C. documents are plainly relevant to this case, as Plaintiff is bringing a retaliation claim that she believes stems from her E.E.O.C. complaint.

[7] Plaintiff raises the same objections with the E.E.O.C. decision as she had with the April 20, 2018 Notice of Judgment.  As stated above, the decision is admissible hearsay and relevant, and is thus admissible evidence.  *Supra* note 6.

47 at 3, ¶ 13.  They also had to submit various documents, including documents about their medical situation and a statement from a health care provider.  Dkt. 39 at 6, ¶ 13; Dkt. 47, at 3 ¶ 13.  After meeting these requirements, the employee's supervisor then had 10 business days to act on the request.  Dkt. 39 at 6, ¶ 13; Dkt. 47 at 3, ¶ 13.

When Plaintiff sought to take leave—which was to start on November 30, 2017 and run through January 2, 2018—she had preapproved leave but did not have sufficient hours to take paid leave.  Dkt. 39 at 7, ¶ 14; Dkt. 39-2, Ex. 2, 98:2-5 (Plaintiff testifying that she did not have enough hours to take leave starting on November 30, 2017); *see* Dkt. 39-6, Ex. 23, at 3-4 (Plaintiff's leave bank request).[8]  As a result, she had to request hours from the leave bank.  Dkt. 39 at 7, ¶ 14; Dkt. 39-2, 98:6-8 (Plaintiff testifying that she requested leave from the leave bank); *see* Dkt. 39-6, Ex. 23, at 3-4 (Plaintiff's leave bank request).  That request was forwarded to her supervisor, Wendy Towle, on November 16, 2017.  Dkt. 39 at 7, ¶ 14; Dkt. 39-2, Ex. 2, 107:12-15 (Plaintiff testifying that Ms. Towle preapproved her leave); *see* Dkt. 39-6, Ex. 23, at 3-4 (leave bank request, sent to Ms. Towle).

On the day that Plaintiff was set to take leave (November 30, 2017), she had not yet been granted any leave bank hours.  Dkt. 39 at 7, ¶ 14; Dkt. 39-2, Ex. 2, 109:2-4 (Plaintiff testifying that she did not have approved leave bank hours on November 30, 2017).  Accordingly, Ms. Towle

---

[8] Plaintiff claims that she disputes the facts in paragraph 14 of Defendant's statement of undisputed material facts as "not verified and therefore improper under Fed. R. Civ. P. 56."  Dkt. 47 at 3-4, ¶ 14.  However, that is not a proper method of disputing a fact pursuant to Federal Rule of Civil Procedure 56(c)(1), which sets forth how a party can dispute a factual assertion.  As such, the Court treats paragraph 14 as undisputed pursuant to Federal Rule of Civil Procedure 56(e)(2).

To the extent that Plaintiff's assertion that this fact is "not verified" portends that the fact is unsupported by Defendant pursuant to Federal Rule of Civil Procedure 56(c)(1), the Court does not find that argument has any merit. Defendant cited to particular materials in the record in supporting his factual assertions in paragraph 14.  Fed. R. Civ. P. 56(c)(1)(A).

(and others) emailed human resources to determine whether Plaintiff's leave had been approved. Dkt. 39 at 7, ¶ 15; Dkt. 39-6, Ex. 23, at 2-3 (emails to HR).[9]  HR noted that they did not receive "any supporting documentation" after they asked her on November 28 to provide certain information.  Dkt. 39 at 7, ¶ 15; Dkt. 39-6, Ex. 23, at 2 (HR email).

Plaintiff submitted supporting documentation for her leave bank request on December 14, 2017.  Dkt. 39 at 8, ¶ 16; *see* Dkt 39-6, Ex. 24, at 2 (Plaintiff's email to HR).[10]  She was informed that her request would be presented to the NGA Leave Bank Board on December 27, 2017, and that the decision could take up to a week.  Dkt. 39 at 8, ¶ 16; *see* Dkt. 39-6, Ex. 24, at 1 (email from HR).  Her leave request was eventually approved on January 3, 2018.  Dkt. 39 at 8, ¶ 17; *see* Dkt. 39-6, Ex. 25, at 2-3 (email approval of leave request).[11]

Even though Plaintiff's leave request was approved in early January, Plaintiff was concerned about the fact that she had not received any pay for the leave she had taken.  Dkt. 39-6, Ex. 25, at 3 (email from Plaintiff to Mr. Meyer expressing concern).  She was told that she was not paid because at the time her paycheck was being issued, she did not have approved advanced sick leave, meaning that the payroll department marked her employment status as "Leave Without Pay" ("LWOP").  Dkt. 39 at 8, ¶ 17; *see* Dkt. 39-6, Ex. 25, at 1 (email explanation to Plaintiff).

---

[9] Plaintiff's purported "dispute" of paragraph 15 as "not verified" is unavailing for the same reasons as explained above.  *Supra* n.8.

[10] Plaintiff claims to dispute this fact. However, Plaintiff does not dispute the fact that she submitted leave documents on December 14, 2017; rather, she contests whether that submission was the *first* time she had submitted those documents. Dkt. 47 at 4, ¶ 16; Dkt. 39-2, 103:1-11 (Plaintiff testifying she submitted documents immediately after her surgery).  Moreover, her assertion that paragraph 16 as "not verified" is unavailing for the same reasons as explained above. *Supra* n.8.

[11] Plaintiff's purported "dispute" of paragraph 17 as "not verified" is unavailing for the same reasons as explained above.  *Supra* n.8.

However, NGA informed Plaintiff that they would pay for the time she was on leave in December, as the leave was approved—they just expected it to take "3-5 business days." Dkt. 39 at 8, ¶ 17; Dkt. 39-6, Ex. 25, at 1.

In January 2018, Plaintiff eventually received some pay for the time that she was on leave. Dkt. 39 at 8, ¶ 18; *see* Dkt. 39-6, Ex. 26 (email exchange between Plaintiff's superiors and HR regarding Plaintiff's pay for her time off).[12]  However, it is disputed whether the pay she received fully covered her time off.  *Compare* Dkt. 39 at 8, ¶ 18 ("Plaintiff was ultimately provided with special pay for the leave periods in December 2017 ….") *with* Dkt. 47 at 4, ¶ 17 ("Plaintiff never received a fully proper payroll adjustment and Defendant shorted her pay.").  Later, Plaintiff claimed that she had other timecard issues due to the December 2017 advanced leave she took. Dkt. 39 at 9, ¶ 20; *see* Dkt. 39-6, Exs. 29-30 (emails from Plaintiff to HR about issues with her timecards).  While Defendant attempted to rectify the problem in April of 2018 by re-certifying Plaintiff's timesheets, *see* Dkt. 39-6, Ex. 31 (email discussion about payroll re-certifying her timesheets), it is disputed whether those efforts cured the underlying issues.  *See* Dkt. 47 at 4, ¶ 17 ("Plaintiff never received a proper payroll adjustment ….."); Dkt. 39-2, Ex. 2, 145:10-146:6 (Plaintiff claiming that the April 2018 adjustments to her payroll were insufficient and resulted in issues for her).

### b. Plaintiff's JDA at ODNI

Around March 2018, Plaintiff applied for Joint Duty Assignments at ODNI.  Her supervisor, Jeffrey Martin, recommended her for the positions she applied for. Dkt. 39 at 9, ¶ 21; *see* Dkt. 39-7, Ex. 33, at 2 (Martin recommendation); Dkt. 39-7, Ex. 33 (email exchange re Martin

---

[12] Plaintiff's purported "dispute" of paragraph 18 as "not verified is unavailing for the same reasons as explained above.  *Supra* n.8.

recommendations).[13]  Plaintiff was eventually approved for a JDA and entered into a memorandum of understanding ("MOU") with ODNI on May 23, 2018.  Dkt. 39 at 9, ¶ 22; Dkt. 47 at 5, ¶ 22; *see* Dkt. 39-7, Ex. 34 (MOU).  That same day, Plaintiff forwarded that MOU to her supervisors and told them that her last day would be on May 25, 2018, and that she would start her JDA on May 29, 2018.  Dkt. 39 at 9-10, ¶ 24; *see* Dkt. 39-7, Ex. 36, at 2 (email from Plaintiff).[14]

Plaintiff's superiors were "surprised" by Plaintiff's start date and worked to push her start date back two weeks.  Dkt. 39 at 9-10, ¶ 24; *see* Dkt. 39-7, Ex. 36, at 2 (email from K. Meyer).  It is typical for JDAs to start anywhere from two to six weeks after an MOU is signed; such a structure enables the agency losing the employee to backfill the position and allows the departing employee to wrap up existing projects.  Dkt. 39 at 9, ¶ 23; *see* Dkt. 39-7, Ex. 35, 40:7-9, 66:1-16 (testimony of Jeffrey Martin).[15]  To that end, the JDA program at NGA acknowledged that GIED leadership had a "say" in when Plaintiff could start her JDA.  Dkt. 39 at 10, ¶ 25; *see* Dkt. 39-7,

---

[13] Plaintiff's purported "dispute" of paragraph 21 as "not verified" is unavailing for the same reasons as explained above.  *Supra* n.8.

[14] Plaintiff's purported "dispute" of paragraph 21 as "not verified" is unavailing, as explained above.  *Supra* n.8.

[15] Plaintiff claims to dispute this fact.  She says that she "was set up for the JDA position and there were misrepresentations concerning the delay in [her] start date as Joel Maloney … one of Plaintiff's supervisors, became aware of Plaintiff's JDA to escape the retaliatory work environment and worked to sabotage Plaintiff's effort.  Dkt. 47 at 5, ¶ 23.  She then cites her own testimony that Mr. Maloney told her "we will just have to see about that" when discussing her start date.  *Id.* (quoting Dkt. 39-2, Ex. 2, 176:4-177:22).

Setting aside the hearsay nature of Plaintiff's testimony, that comment is not inconsistent with Defendant's assertion about what is typical for employees who start JDAs.  Rather, Plaintiff focuses on her own situation; she does not muster any evidence to rebut Defendant's evidence as to the typicality of starting JDAs two to six weeks after MOUs.

Ex. 36, at 1 (email from JDA program coordinator to Maloney and Meyer).[16]  Eventually, Plaintiff's superiors, the JDA program, and ODNI agreed set on a start date of June 10, 2018.  Dkt. 39 at 10, ¶ 25; *see* Dkt. 39-7, Ex. 36 (email exchange between ODNI and NGA employees).  On May 30, 2018, ODNI told Plaintiff that her start date was delayed to June 10, 2018.  Dkt. 39 at 10, ¶ 26; *see* Dkt. 39-7, Ex. 37 (ODNI email).[17]

Before she started at ODNI, Plaintiff sent an email to her colleagues, thanking them for "making [her] time at NGA a memorable one."  Dkt. 39 at 4, ¶ 4; Dkt. 47 at 2, ¶ 4; *see* Dkt. 39-2 at Ex. 10 (email from Plaintiff).  She did not identify any harassing behavior in that email.  Dkt. 39 at 4, ¶ 4; Dkt. 47 at 2, ¶ 4.

## B.  Procedural Background

Plaintiff filed her original Complaint in the United States District Court for the District of Columbia on February 2, 2021.  Dkt. 1.  Service was effectuated on Defendant on May 3, 2021.  Dkt. 6.  The parties filed a consent motion to transfer the case to this district on June 9, 2021, Dkt. 8, which was granted the next day, Dkt. 9.  The case was transferred into this district on June 22, 2021.  Dkt. 10.

Defendant filed a Motion to Dismiss Plaintiff's original Complaint on August 23, 2021.  Dkt. 12.  Plaintiff then filed an Amended Complaint on September 6, 2021, Dkt. 15, which Defendant moved to dismiss again on September 20, 2021, Dkt. 16.  Plaintiff opposed that motion on October 4, 2021, Dkt. 19, and Defendant replied in support of his motion on October 12, 2021,

---

[16] Plaintiff's purported "dispute" of paragraph 25 as "not verified" is unavailing for the same reasons as explained above.  *Supra* n.8.

[17] Plaintiff's purported "dispute" of paragraph 26 as "not verified" is unavailing for the same reasons as explained above.  *Supra* n.8.

Dkt. 20.  The Court denied Defendant's Motion to Dismiss on July 26, 2022.  Dkt. 30.  Defendant

then answered the Complaint on August 9, 2022.  Dkt. 31.

The Court set dispositive briefing deadlines on October 20, 2022.  Dkt. 37.  Both parties

filed Motions for Summary Judgment on October 28, 2022.  Dkt. Nos. 38; 41.  Defendant opposed

Plaintiff's Summary Judgment Motion on November 14, 2022, while Plaintiff opposed

Defendant's motion on November 18, 2022.  Dkt. Nos. 46;4 7.  The parties replied in support of

their respective motions on November 30, 2022.  Dkt. Nos. 49; 50.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the

record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va.

2014) (quoting Fed. R. Civ. P. 56(a)).

"A material fact is one 'that might affect the outcome of the suit under the governing law.'

A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return

a verdict for the non-moving party.'" *Id.* at 615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242

F.3d 179, 183 (4th Cir. 2001)).  The moving party bears the "initial burden to show the absence of

a material fact." *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "Once a motion for summary judgment is

properly made and supported, the opposing party has the burden of showing that a genuine dispute

exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

(1986)).

On summary judgment, a Court reviews the evidence in the light most favorable to the non-

moving party. *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va.

2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  This is a "fundamental

principle" that guides a Court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 570 (4th Cir. 2015). "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. And a "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

## III. ANALYSIS

Defendant moves for summary judgment on various grounds. He first argues that Plaintiff cannot establish a *prima facie* case for ADEA or Title VII retaliation, as the undisputed evidence shows: (1) Plaintiff did not suffer an adverse action, and (2) even assuming she suffered an adverse action, there is no causal link between those actions and her protected activity. He also avers that the undisputed evidence shows legitimate, non-retaliatory bases for the purported "adverse actions" that Plaintiff identifies.

Plaintiff disagrees.  She argues that there are genuine issues of material fact about whether Defendant took adverse action against her and whether there is a causal link between those adverse actions and her EEO activity.  She also claims that there are genuine disputes of material fact as to whether the "legitimate, non-retaliatory" reasons that Defendant cites are mere pretext.

The parties agree that in evaluating Plaintiff's retaliation claims,[18] the Court utilizes the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[19] Under that framework, Plaintiff must first establish a *prima facie* case of retaliation.  *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018).  To do so, she must show: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action."  *Id.* at 327-28 (cleaned up).  If Plaintiff makes that showing, the burden then shifts to Defendant, who must show that the "purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).  If the Defendant meets his burden, then the burden returns to Plaintiff: she must "rebut [Defendant's] evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons but were a pretext for discrimination."  *Id.* (cleaned up).

---

[18] The standard for Title VII and ADEA retaliation claims is the same, which the parties do not appear to dispute.  *Harman v. Unisys Corp.*, 746 F. Supp. 2d 755, 761-62 (E.D. Va. 2010).

[19] Alternatively, Plaintiff could have shown retaliation through direct evidence.  *Walton v. Harker*, 33 F.4th 165, 171 (4th Cir. 2022).  Plaintiff has not asserted that there is direct evidence supporting her retaliation claim; instead, she argues that she has met the requirements set forth by *McDonnell Douglas*.  Dkt. 47 at 10.

## A. Plaintiff's *Prima Facie* Case

The Court first examines whether Plaintiff has met her burden to establish a *prima facie* case of retaliation.  Defendant does not appear to contest that Plaintiff "engaged in a protected activity."  The undisputed facts confirm as much, as Plaintiff engaged in "protected activity" at least when she filed an EEOC complaint on March 22, 2016.[20]

### 1. Adverse Action

The parties agree that in determining whether Plaintiff suffered an "adverse action," the Court must apply the standard from *Burlington N. & Santa Fe R. R. Co. v. White*, 548 U.S. 53 (2006).[21]  Under that standard, to establish an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 68 (cleaned up).

There are various actions that can constitute "adverse actions" for the purposes of a retaliation claim.  This includes "ultimate" employment decisions, such as an employer's decision to hire, fire, promote, or demote an employee.  *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981).  But it also includes more than that, as "adverse employment actions" include any employer actions that have a "significant detrimental effect" on an employee.  *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).  At bottom, adverse employment actions include any "acts or harassment [that]

---

[20] The other instances of protected activity are set forth *infra*.

[21] In filing his Summary Judgment Motion, Defendant argued that the *Burlington* standard does not apply to federal employees like Plaintiff.  Dkt. 39 at 13-14.  However, before Defendant filed his reply, the Fourth Circuit held that, indeed, the *Burlington* standard applies to federal and private-sector employees alike.  *Laurent-Workman v. Wormuth*, 54 F.4th 201, 216 (4th Cir. 2022).  Accordingly, Defendant has conceded that the *Burlington* standard applies to this case.  Dkt. 49 at 11-12.

adversely [a]ffected the terms, conditions, or benefits of the plaintiff's employment." *Von Gunten v. Md.*, 243 F.3d 858, 865 (4th Cir. 2001) (cleaned up) *abrogated on other grounds by Burlington N.*, 548 U.S. 53.

An adverse employment action can consist of discrete acts. For example, discrete acts can "include such things as 'termination, failure to promote, denial of transfer, or refusal to hire.'" *Shaw v. Aramark Mgmt. Servs. Ltd. P'ship*, 903 F. Supp. 2d 413, 418 (E.D. Va. 2012) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)). It can also be less drastic employment actions, such as "loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone*, 178 F.3d at 255.

However, an adverse action can also be more than a single discrete act. "Retaliatory harassment can constitute adverse employment action" for an ADEA retaliation claim. *Von Gunten*, 243 F.3d at 869. To be an "adverse employment action," retaliatory harassment must be "so severe and pervasive to dissuade a reasonable worker from making or supporting a charge of discrimination engaging in a protective activity." *Laurent-Workman*, 54 F.4th at 217. Essentially, retaliatory harassment can satisfy the "materially adverse" element of the *prima facie* case if it is severe and pervasive enough to meet the *Laurent-Workman* standard. *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 839 (E.D. Va. 2016).[22]

---

[22] Defendant asserts that "a series of acts cannot be packaged into one adverse action," meaning that harassment cannot qualify as an "adverse action" for these purposes. Dkt. 39 at 19. That argument runs contrary to the Fourth Circuit's recent opinion in *Laurent-Workman*. As the Fourth Circuit made clear in *Laurent-Workman*, "the anti-retaliation provision seeks to deter … employer retribution that chills employee opposition to discrimination." 54 F.4th at 216. Accordingly, "*any* action that 'well might have dissuaded a reasonably worker from making or supporting a charge of discrimination' satisfies the 'materially adverse standard under the anti-retaliation provision.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 68). That holding is consistent with the Fourth Circuit's prior case law analyzing claims of retaliation premised on harassment. *See Clehm v. BAE Sys. Ordnance Sys., Inc.*, 786 F. App'x 391, 394 (4th Cir. 2019) (analyzing retaliation claim that relied on harassment from coworkers).

14

It is undisputed that Plaintiff was (at least for some time) not paid for time that she took off in December 2017. *See* Dkt. 39 at 14 (acknowledging that Plaintiff was shorted $6,408 in pay); Dkt. 47 at 14 (citing Plaintiff testimony about being shorted pay). While Defendant points to the various *reasons* why Plaintiff was shorted pay—like her purported failure to submit the requisite forms—that is not relevant to the adverse action inquiry; rather, that goes to whether there was a legitimate, non-retaliatory reason for her pay being shorted. *Foster*, 787 F.3d at 249. A decrease in pay is a quintessential "adverse action," and the Court finds no reason to divert from that principle here. *Boone*, 178 F.3d at 255.

There are genuine disputes of material fact concerning other potential adverse actions that Plaintiff suffered. For example, Plaintiff claims that her timecard was manipulated in April of 2018, resulting in underpayment, which Defendant disputes. *Compare* Dkt. 39 at 15-16 (Defendant claiming there is "no record evidence" of April 2018 timecard manipulation) *with* Dkt. 39-2, Ex. 2, at 145:13-146:6 (Plaintiff testifying that she lost hours she should have earned). Similarly, it is also disputed whether Plaintiff's performance evaluation was downgraded in early 2018, leading to a decrease in pay. *Compare* Dkt. 39 at 16 (Defendant claiming there is "no record evidence" that Plaintiff's performance evaluation was downgraded) *with* Dkt. 39-2, Ex. 2, at 134:23-135:12, 139:18-21 (Plaintiff's testimony about her performance evaluation downgrade).[23] Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could infer that

---

[23] Defendant claims that Plaintiff's assertions related to her performance downgrade do not create a genuine dispute, citing the Fourth Circuit's opinion in *Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985), where the panel held that a nonmoving party in a summary judgment motion "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." 769 F.2d at 214. That is not the case here: Plaintiff is not "speculating" or creating disputes by building inferences upon one another; rather, she is asserting facts. Whether or not there is sufficient evidence to support Plaintiff's factual claims, and whether it is credible, is not for this Court to decide.

both of those actions could "dissuade a reasonable worker from making or supporting a charge of discrimination," and thus could be adverse actions. *Laurent-Workman*, 54 F.4th at 217.

There is also a genuine dispute about whether the "retaliatory harassment" that Plaintiff experienced is material enough to constitute an "adverse action." The parties agree on certain facts. First, that Plaintiff's JDA at ODNI was delayed. *See* Dkt. 39 at 24 (Defendant acknowledging that there is record evidence that Plaintiff's JDA was delayed in May 2018); Dkt. 47 at 21-22 (Plaintiff discussing her JDA delay). Second, that Plaintiff was assigned a different supervisor in early 2018. *See* Dkt. 39 at 17-18 (Defendant acknowledging that Plaintiff was moved to a different supervisor). A reasonable jury could infer that those actions in early 2018, when combined with the other actions Plaintiff experienced during that time, constitute "materially adverse" retaliatory harassment. *See Caldwell v. Jackson*, No. 1:3-cv-707, 2009 WL 2487850, at *16, n. 18 (M.D.N.C. Aug. 11, 2009) (on summary judgment for a retaliatory harassment claim, "the relevant question … is whether, taking all of the evidence in the light most favorable to the plaintiff, and considering all of the alleged retaliatory actions in context, a jury could find that a reasonable employee would have been dissuaded from engaging in protected activity").

In sum, there is either undisputed evidence of, or a genuine dispute over, the following adverse actions:

- The underpayment for the leave that Plaintiff took in December 2017, which Plaintiff contends results from the actions her employer took from November 2017 through April 2018;
- The purported time-card manipulation in April of 2018;
- The performance evaluation downgrade in April of 2018;
- The "retaliatory harassment" beginning in late 2017/early 2018, including her change in supervisor, and continuing until she left for her JDA at ODNI in May of 2018.

There are other actions that Plaintiff points to that do not rise to the level of adverse actions. For example, Plaintiff argues that "in or about November and December 2017, Plaintiff's

16

supervisors … were aware of Plaintiff's EEO protected activity and began to take retaliatory actions against Plaintiff because of her EEO case." Dkt. 47 at 14.  The only support for that assertion is the allegations about her underpayment in December 2017; there is no evidence that she suffered any adverse action in November 2017.  Similarly, Plaintiff asserts that she was subjected "to an investigation concerning time card fraud[,]" but can only point to a single stray comment from a "Deputy IG Inspector" to support that assertion.  *Id.* at 15 (citing Dkt. 39-2, Ex. 2, at 126:3-16, 149:6-11).  There is no evidence that she was subject to a full-fledged investigation.  Plaintiff also claims that her desk was searched by Deputy IG Norris.  However, Plaintiff only relies on hearsay evidence—a document written by another individual and her conversation with that individual—to support that claim.  *See* Dkt. 39-2, Ex. 2, 77:8-10 (Plaintiff's testimony that she did not personally witness the desk search); 170:5-16 (Plaintiff's testimony about hearing about the desk search from another individual).  The Court cannot consider that hearsay evidence at this stage, meaning that there is simply no factual support for the alleged desk search.  *Md. Highways Contractors Ass'n v. Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991).  Finally, Plaintiff argues that there are some "acts that could be construed as retaliatory intimidation of Plaintiff, such as the firing of Plaintiff's co-worker as well as the disregard of one of the Plaintiff's witnesses in the Agency's EEO process."  Dkt. 47 at 16.  But the only evidence that she can muster in support is her own speculation in her own interrogatories.  Under *Beale*, that speculation cannot create a factual dispute.  Moreover, it is hard to see how the failure to interview a witness on an EEO witness list and the firing of a co-worker could be considered an adverse action.

### 2. Causal Connection

Although Plaintiff has shown that there is a genuine dispute over whether she suffered an adverse action, she cannot show that there is a causal link between her protected activity and the

various adverse actions that the Court has credited above.  This causation requirement means that the Plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tx. So. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  At bottom,  Plaintiff must show that "the desire to retaliate was the but-for cause of" the adverse actions she suffered.  *Id.* at 339.

There are two principal ways to show this causal link.  First, Plaintiff could present direct evidence that "suggests that the adverse employment action occurred because of the protected activity."  *Johnson v. United Parcel Service, Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021) (citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)).  Second, Plaintiff could show that "the adverse act bears sufficient temporal proximity to the protected activity."  *Id.* (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).  However, a lack of temporal proximity does not mean that Plaintiff cannot establish the requisite causal link.  *See Smith v. CSRA*, 12 F. 4th 396, 417 (4th Cir. 2021) ("The existence of relevant facts *alone* … may be used to establish a causal connection between the protected activity and the adverse action.").  For example, Plaintiff could submit evidence of "regular acts showing animus or antagonism, coupled with valid reasons why the adverse action was not taken immediately."  *Hart v. Hanover Cnty. Sch. Bd.*, No. 3:10-cv-794, 2013 WL 1867388, at *5 (E.D. Va. May 2, 2013).

Plaintiff only relies on temporal proximity to establish the causal link she needs here.  In particular, she claims that she "filed her claims of unlawful discriminatory acts and reprisals with the EEOC against the Agency in 2017," indicating that the protected activity bears a close temporal proximity to the adverse acts. Dkt. 47 at 17.  While she claims that there is other, non-temporal evidence that support the causal link, all she can suggest in support of this premise is the "fact" that "the individuals who undertook the adverse actions against Plaintiff were on notice of her

protected activity." *Id.* at 19.  The mere fact that certain coworkers and/or supervisors knew about her EEOC activity does not "suggest that the adverse employment action occurred because of the protected activity," *Johnson*, 839 F. App'x at 784, nor is it indicative of "regular acts showing animus or antagonism," *Hart*, 2013 WL 1867388, at *5.  To hold otherwise would render the causation requirement null: a retaliation plaintiff would be able to establish causation by simply showing that her coworkers knew about her protected activity without any link to the adverse actions she experienced.

It is important to note that there must be temporal proximity between the adverse actions Plaintiff suffered and the *protected activity* she engaged in.  "Protected activity" is not any and all activity related to an EEOC case.  Rather, it can only "take the form of either opposing a practice prohibited under Title VII [or the ADEA]… or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII [or the ADEA] …." *Pitter v. Comm. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 394 (D. Md. Aug 18, 2010).  In other words, a complainant is engaging in protected activity when she (1) makes a charge; (2) testifies; (3) assists; or (4) participates in any manner vis-à-vis her EEOC case.

There are three instances of protected activity that are relevant here.  First, when Plaintiff filed her formal EEO complaint on March 22, 2016.  Dkt. 39 at 4, ¶ 5; Dkt. 47 at 2-3, ¶ 5.  Second, when she requested a hearing before the E.E.O.C. on December 26, 2016.  Dkt. 39 at 5, ¶ 7; Dkt. 47 at 3, ¶ 7; *see* Dkt. 39-3, Ex. 14, at 3 (request for hearing).[24]  And third, when Plaintiff filed her

---

[24] In her Amended Complaint, Plaintiff alleged that she filed her EEOC case on December 6, 2017.  Dkt. 15 ¶ 13.  Plaintiff reiterates that date in her response to Defendant's Summary Judgment Motion.  Dkt. 47 at 18 (referring to "Plaintiff's protected activity of filing the EEOC Case in December 2017").  However, the evidence is clear, and Plaintiff does not dispute, that she filed her EEOC Complaint on March 22, 2016, and requested a hearing on December 26, 2016.  Dkt. 39 at 4-5, ¶¶ 5, 7; Dkt. 47 at 2-3, ¶¶ 5, 7 (Plaintiff agreeing about the timing of Plaintiff's EEOC complaint and December 2016 hearing); Dkt. 39-2, Ex. 11 (formal EEO claim, dated March

response to the Administrative Judge's Notice of Summary Judgment on May 11, 2018.  Dkt. 39 at 6, ¶¶ 10-11, Dkt. 47 at 3, ¶¶ 10-11; Dkt. 39-2, Exs. 18 and 19 (Plaintiff's filings).

There are several other occurrences that are related to Plaintiff's EEOC case but do not constitute "protected activity" relevant to the causation inquiry.  The fact that NGA's legal office received Plaintiff's E.E.O.C. complaint on January 27, 2017 does not matter: Plaintiff filed that complaint on December 26, 2016, which is the relevant protected activity under 42 U.S.C. § 2000e-3.  Plaintiff's E.E.O.C. complaint related to the instant case—which was informally filed in July 2018 and formally filed in October 2018—came after all of the alleged "adverse actions" and is thus irrelevant.  *See Francis v. Booz Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." (cleaned up)).

It follows that there is not a sufficient temporal proximity between the adverse actions that took place prior to May 11, 2018, and Plaintiff's protected activity.  There are four potential adverse actions that took place prior to May 11, 2018: (1) the December 2017 underpayment due to the medical leave Plaintiff took, which Plaintiff asserts was effectuated by Plaintiff's actions between December 2017 and April 2018; (2) the purported time-card manipulation in April 2018; (3) the alleged performance evaluation downgrade in April 2018; and (4) the general "retaliatory harassment" that took place before May 11, 2018.  The closest-in-time protected activity to those adverse actions is Plaintiff's hearing request on December 26, 2016, which took place a year (or more) before those "adverse actions" occurred.  As a matter of law, that amount of time is

---

24, 2016); Dkt. 39-3, Ex. 14, at 3 (request for hearing, dated December 26, 2016).  There is no evidence in the record that Plaintiff filed her EEOC complaint in December of 2017, nor is there any record that she engaged in any other protected activity in December of 2017.

insufficient to provide the temporal proximity supporting a causal link.  *See Perry v. Kappos*, 489

F. App'x 637, 643 (4th Cir. 2012) ("[W]e have held that a three-or four month lapse between the

protected activities and [the adverse action] was 'too long to establish a causal connection by

temporal proximity alone'" (quoting *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233

(4th Cir. 2006)); *Adams v. Dep't of Def.*, No. 1:16-cv-1468, 2017 WL 6699484, at *5 (E.D. Va.

Sep. 29, 2017) (almost five month separation between adverse action and protected activity was

"too great to establish a causal connection in itself").

    There is only one potentially adverse action that occurred after Plaintiff filed her papers

related to the Notice of Summary Judgment on May 11, 2018: the delay in her JDA at ODNI.

However, that delay is not an adverse action on its own, but is considered as a part of the general

retaliatory harassment she alleges.  Standing alone, that 12-day delay in Plaintiff's job change

would not suffice as an "adverse action."  *See Fellores v. Winter*, 2:6-cv-551, 2007 WL 2471527,

at *3 (E.D. Va. Aug. 23, 2007) (finding no adverse action when plaintiff's promotion was delayed

by over five months); *Jeffrey v. Montefiore Med. Ctr.*, No. 11 Civ. 6400 (RA), 2013 WL 5434635,

at *20 (S.D.N.Y. Sep. 27, 2013) (two-month delay in promotion not a materially adverse action).

Indeed, Plaintiff does not argue that the delay on its own is a sufficient adverse action.  *See* Dkt.

47 at 15-16 (arguing that the JDA delay should not be considered as a "separate action" but rather

as "part of Defendant's retaliatory harassment of Plaintiff").  There are no other potentially adverse

actions that Plaintiff can point to after May 11, 2018, meaning she does not have sufficient

evidence to support a claim premised on retaliatory harassment from May 11, 2018, until she left

for her JDA.

    In sum, the evidence shows that Plaintiff cannot establish the requisite causal link between

her protected activity and any adverse action that she suffered.  She does not present any direct

evidence that indicates the adverse actions occurred because of her protected activity.  Nor can she

rely on temporal proximity: before May of 2018, the latest protected activity she engaged in was

in December of 2016, which is a year or more removed from the adverse actions she experienced.

That passage in time vitiates any inference of causation due to temporal proximity.  Finally, while

Plaintiff did engage in protected activity on May 11, 2018, there is only one potential adverse

action after that date (the delay in starting her JDA), which is not sufficient on its own to be a

materially adverse action.

### B. Legitimate, Non-Retaliatory Reasons for Adverse Actions

Even if there were sufficient bases to establish the causal link between the adverse actions

and Plaintiff's protected activity, Defendant has presented legitimate bases for those adverse

actions.  Defendant has put forward evidence that Plaintiff was not paid in December 2017 because

she was put on leave without pay due to her failure to submit the adequate forms, and that NGA

took various measures to fix any errors. Dkt. 39 at 7-8, ¶¶ 15-17; *see* Dkt 39-6, Ex. 24, at 2

(Plaintiff's email to HR).  He further avers that Plaintiff's cards were adjusted in April of 2018 to

"ensure that Plaintiff received updated sick leave hours."  Dkt 39 at 3, ¶ 20; Dkt. 39-6, Ex. 31

(emails about recertification).  Defendant also explained that they reassigned Plaintiff to a new

supervisor because her prior supervisor had left, and the only other potential supervisor was "not

feasible" because that supervisor could not view foreign classified information.  Dkt. 39-2, Ex. 3,

19:8-11:20 (Maloney testimony).  Finally, Defendant clarified that Plaintiff's JDA at ODNI was

delayed because the typical JDA starts two to six weeks after the individual signs an MOU to allow

the employer to backfill the vacated job and finish the departing employee's projects.  Dkt. 39 at 9, ¶ 23; *see* Dkt. 39-7, Ex. 35, 40:7-9, 66:1-16 (testimony of Jeffrey Martin).[25]

Plaintiff cannot show that Defendant's offered explanations are pretext.  As to Plaintiff's underpayment in December 2017, Plaintiff asserts that her medical leave was "preapproved" and that Defendant's employees "had promised to turn around the leave bank approval around as quickly as possible.[26]  But neither of those assertions show that Plaintiff's proffered reason is pretextual.  To rebut Defendant's explanations about why Defendant changed her supervisor and delayed her JDA, Plaintiff relies on her own testimony merely speculating about the true reasons behind Defendant's actions.  That speculation is insufficient as a matter of law to establish pretext. *See Baker v. City of Chesapeake*, 644 F. App'x 222, 223 (4th Cir. 2016) (noting that in opposing summary judgment, "the nonmoving party must rely on more than … mere speculation" (cleaned up)); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 n.1 (4th Cir. 2000) ("mere speculation" insufficient to establish pretext).

In sum, even if Plaintiff could have met her burden of establishing her *prima facie* case, Defendant has set forth legitimate, non-retaliatory reasons for the actions that Plaintiff experienced.  Plaintiff has not put forth any non-speculative evidence to establish that those

---

[25] The only adverse action for which Plaintiff does not offer a legitimate, non-retaliatory basis is the alleged performance evaluation downgrade in April 2018.

[26] Plaintiff also claims that she timely submitted the leave documentation in November of 2017.  However, the record evidence shows that she submitted the documents on December 14, 2017—in other words, after she was required to.  Moreover, even if she *had* submitted the required documents in November 2017, it does not give rise to an inference that the administrative issues with her submission are pretext, as Plaintiff does not dispute the detailed factual evidence that Defendant presented about the various measures that Plaintiff's superiors took to obtain the requisite documentation and fix her leave issues.

reasons are mere pretext.  Accordingly, Defendant is entitled to judgment as a matter of law for that reason, as well.

## IV.   CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 38) is GRANTED as to both counts in Plaintiff's Amended Complaint (Dkt.15).  Plaintiff's Motion for Partial Summary Judgment (Dkt. 41) is DENIED as MOOT.

The Clerk is directed to enter judgment for Defendant pursuant to Federal Rule of Civil Procedure 58, vacate the motions hearings and trial date from the Court's docket, and close this civil action.

It is SO ORDERED.

Alexandria, Virginia
February 27, 2023

_____ /s/
Rossie D. Alston, Jr.
United States District Judge